# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **DARRON MORGAN,** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **C.A. NO. C-11-124** |
| | § | |
| **TDCJ McCONNEL UNIT, et al.,** | § | |
| **Defendants** | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff is in the custody of the Texas Department of Criminal Justice-Correctional Institutions Division (TDCJ-CID) and currently is incarcerated at the McConnell Unit in Beeville, Bee County, Texas.  Appearing *pro se*, and *in forma pauperis*, plaintiff filed this civil rights complaint pursuant to 42 U.S.C. § 1983 on May 19, 2011.  Plaintiff alleges that his constitutional rights under the Eighth Amendment to the United States Constitution were violated when prison officials were deliberately indifferent to his serious medical needs. Pending is defendants Maximiliano Herrera and William Burgin's motion for summary judgment, filed under seal on January 20, 2012 (D.E. 52).  Plaintiff filed a response to the motion on March 5, 2012 (D.E. 59).

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is proper in this court because the actions about which plaintiff complains occurred in Bee County, Texas.

# BACKGROUND

## A.  Medical Records

The following recitation of facts is taken from the pleadings and the testimony at the evidentiary hearing held in this case with the facts construed in the light most favorable to plaintiff.  On May 11, 2009 plaintiff was seen by a physician at the McConnell Unit for complaints of headaches, sinus congestion, sinus drainage and sore throat.  He was assessed with allergies and sinusitis and prescribed Erythrocin, a Kenalog injection and a nasal spray (D.E. 52-4 at 3).  On May 26, 2009 plaintiff submitted a written request asking to see a doctor because he was in great pain from a sinus infection.  He also said that he had developed a foul odor and had sores in his nose that were eating his flesh (D.E. 52-4 at 5).  On May 29, 2009 plaintiff was seen by medical personnel and it was noted that his nasal mucosa was red on the left side and swollen bilaterally.  He was prescribed another Kenalog injection, Erythrocin and Claritin.  In addition, plaintiff was given a double antibiotic ointment and told to apply it three times a day to his nasal sores (D.E. 52-4 at 6-7).

The next day, May 30, 2009, and again on May 31, 2009 plaintiff submitted requests for medical treatment, saying that he had not seen a doctor since May 13, 2009.  He claimed that his nasal passage was rotting (D.E. 52-4 at 8, 11).  Plaintiff was seen by a doctor on June 2, 2009 who diagnosed him with sinusitis.  His medications were continued and he was given the earlier-prescribed Kenalog injection (D.E. 52-4 at 10).

On June 10, 2009 and June 15, 2009, plaintiff submitted requests for treatment, saying his sinus infection was worse and that he was suffering from hearing loss, headaches, a sore in his nose and difficulty eating (D.E. 52-4 at 12-13, 16).  He was seen by a doctor on June 16, 2009 who noted that plaintiff had congestion, pain in the frontal sinuses and that his ears were stopped up.  The sores in his nose had cleared up completely, but he had developed a vesicular rash on both shoulders, which burned when he showered.  Plaintiff was prescribed Prednisone tablets, a nasal spray, Triamcinolone cream for the rash and Bactrim tablets.  The doctor ordered that plaintiff's sinuses be X-rayed and set up a follow-up visit (D.E. 52-4 at 14).  On June 22, 2009 plaintiff inquired about why he had not yet gone for the X-ray and was told that it had been scheduled and to wait for the lay-in (D.E. 52-4 at 18).

On June 30, 2009 plaintiff was seen by a nurse practitioner who noted that he was still having sinus problems.  He was complaining of clogged ears, clear nasal drainage and sinus pressure "for about a year."  An X-ray had been taken and was pending.  Plaintiff was to finish the Prednisone tablets and continue with his nasal saline spray and other medications.  He also was using an Albuteral inhaler daily for asthma (D.E. 52-4 at 20).  The nurse practitioner submitted a request that plaintiff be evaluated by an ear, nose and throat specialist at the University of Texas Medical Branch ("UTMB") (D.E. 52-4 at 19).  On July 13, 2009 it was noted that the X-ray showed no specific abnormalities of the paranasal sinuses (D.E. 52-4 at 22).

On July 7, 2009 plaintiff complained about the rash on his shoulders which had spread to his face, lower back and chest (D.E. 52-4 at 21).  Plaintiff submitted a complaint on August 5, 2009 that his symptoms were becoming worse (D.E. 52-4 at 23).

On September 2, 2009 plaintiff sent a letter to defendant William Burgin, complaining about a lack of medical treatment.  He said that a doctor had prescribed him a double antibiotic ointment to use in his nose even though it was for external use only.  He believed that the ointment caused him to have nose bleeds, rashes, difficulty breathing and a great deal of facial pain.  He claimed that he had submitted multiple requests for medical treatment, resulting in either being informed that he had been scheduled to be seen, or in some cases receiving no reply at all.  At the bottom of the letter it is noted, "Schedule [with] Dr. Stein.  WB," indicating that defendant Burgin arranged for plaintiff to see Dr. Stein (D.E. 52-4 at 24).

On September 26, 2009 plaintiff submitted a request for medical treatment, stating that his head was constantly pounding, his ears were ringing and he had difficulty swallowing (D.E. 52-4 at 25).  Plaintiff was seen by Dr. Stein on September 29, 2009, who noted that for more than one year plaintiff had been complaining of sinus and throat problems.  He had heavy post-nasal drip, constant sinus pain, and felt a watery sensation that shifted when he moved.  He coughed or spit up thick green sputum and phlegm.  Dr. Stein noted that he would inquire about plaintiff's referral to an ear, nose and throat specialist and would seek a CT scan of plaintiff's sinuses.  In addition he was prescribed Prednisone, Sudafed, Doxycycline and a saline nasal spray (D.E. 52-4 at 26).

Plaintiff was seen at UTMB in Galveston on October 2, 2009 for chronic sinusitis. He was complaining of facial pain, throat and ear pain. He also had a history of asthma. After being examined, plaintiff was prescribed Becanase nasal spray or a nasal steroid spray (D.E. 52-4 at 27).

On October 9, 2009 plaintiff complained that the nasal spray was not helping at all and that he was having trouble breathing (D.E. 52-4 at 32). He was seen by a nurse on October 12, 2009. He was using his Albuterol inhaler every night and three to four times during the day. His lungs had wheezes to the middle and lower fields bilaterally and he was diagnosed with uncontrolled asthma and allergic rhinitis. He was prescribed Lortadine and a triamcinolone inhaler and was to continue with the Beconase nasal spray. He also was given a breathing treatment (D.E. 52-4 at 33). Plaintiff returned for a follow-up visit on October 27, 2009 and said he had a nasal infection that was causing him to overuse his Albuterol. He said it felt like his throat was closing off. He was described as having moderate persistent asthma and possible rhinitis. Prednisone was added to the other medications he was taking (D.E. 52-4 at 34-35).

A CT scan of plaintiff's sinuses on December 18, 2009 showed a small right maxillary mucus retention cyst (D.E. 52-4 at 37-40). On December 31, 2009 and January 5, 2010 plaintiff wrote to ask about the results of the CT scan. He also said he was having difficulty swallowing and the pain was becoming unbearable (D.E. 52-4 at 42-43). Plaintiff was given the results of the CT scan on January 5, 2010 and the Lortadine was changed to Periactin (D.E. 52-4 at 44).

5

On February 1, 2010 plaintiff wrote to Dr. Stein saying that he had tonsillitis and that it was painful for him to chew and swallow (D.E. 52-4 at 46).  Plaintiff was scheduled to see a medical provider the next day but did not go to the appointment (D.E. 52-4 at 47).

Plaintiff was seen at a follow-up visit for his asthma on February 11, 2010.  He was doing well and no complaints about his breathing were noted.  He was using his Q-var six times a day but not using the Albuterol as much.  Plaintiff did complain about his chronic sore throat and tonsillitis.  His pharynx was very inflamed but his tonsils were not enlarged.  He also had severe heartburn and the doctor wondered if gastro-esophogeal reflux disease ("GERD") was the cause of his pharyngitis.  He was prescribed ranitidine for the GERD, in addition to his other medications (D.E. 52-4 at 8).

On March 29, 2010 plaintiff reported that the GERD symptoms initially had gotten better with medication, but subsequently had worsened (D.E. 52-4 at 50).  Plaintiff was scheduled to see a medical provider the next day but did not attend the appointment (D.E. 52-4 at 51).  On April 20, 2010 plaintiff complained that his sinus infection was worse and that he had a hard knot and sores in the tip of his nose.  He was scheduled for an appointment three days later but did not attend (D.E. 52-4 at 52-53).

On May 9, 2010 plaintiff went to the clinic and it was noted that he had a pass to go to the clinic at any time for breathing problems (D.E. 52-4 at 54).  On May 11, 2010 plaintiff asked to see a medical provider because of some serious problems related to his sinus issues, but then failed to appear the next day at his scheduled appointment or at an appointment set the next month (D.E. 52-4 at 55-59).  In August and September 2010 plaintiff submitted

three requests for medical care, but failed to show up for three scheduled appointments (D.E. 52-4 at 60-65).

In October and November plaintiff submitted medical care requests three times and failed to show up for scheduled appointments (D.E. 52-4 at 67-72). Plaintiff was seen at the clinic on December 1, 2010 for swelling to his throat. His tonsils were slightly enlarged and his throat was erythemic with no exudates. He was proscribed Amoxicillin and Chlorpheniramine (D.E. 52-4 at 75). On December 3, 2010 plaintiff complained that the tip of his nose appeared to be rotten, but when he went for treatment he was given only cold medication (D.E. 52-4 at 76).

On December 12, 2010 plaintiff said that he missed an appointment scheduled for December 10, 2010 because he did not receive notice of it (D.E. 52-4 at 78). An appointment was set for the next day but plaintiff could not attend because he was in administrative segregation and a security escort was not available (D.E. 52-4 at 79). Plaintiff was seen on December 14, 2010 complaining of pain to his left neck area. His nasal mucosa was slightly erythematous with mild congestion and he had mild tonsilar enlargement with scant post-nasal drainage and no lymphadenopathy. He was prescribed Flunisolide nasal spray (D.E. 52-4 at 82).

On December 28, 2010 plaintiff wrote that he wanted to see a doctor as soon as possible because he was in a great deal of pain (D.E. 52-4 at 83). He was seen the next day and reported that he had low back pain for the previous three days. Following an

examination plaintiff was prescribed Ibuprofen for pain and told to take warm showers (D.E. 52-4 at 84-89).

On January 5, 2011 plaintiff complained of intense itching that began after using a prison-issued blanket and jacket (D.E. 52-4 at 90).  He was scheduled for an appointment on January 10, 2011 but was unable to attend because he was in administrative segregation and there was no security escort available (D.E. 52-4 at 91).  Plaintiff missed an appointment on January 12, 2011 for the same reason (D.E. 52-4 at 92).

On January 20, 2011 plaintiff was seen for an asthma follow-up examination.  He reported using his Albuterol inhaler about two times daily and about twelve times during the night.  It was noted that no acute management was needed during the previous six months.  Plaintiff also reported pain in his left flank during the previous two weeks.  A urinalysis was ordered (D.E. 52-4 at 93).  On January 27, 2011 plaintiff asked for another Flunisolide nasal spray and also reported what he believed to be kidney pain (D.E. 52-4 at 95).  He was seen on January 29, 2011 and it was noted that he was not congested and there was no indication for the Flunisolide.  The urinalysis had not been done and it was ordered again (D.E. 52-4 at 96).  His back pain was believed to be a muscle spasm and he was prescribed Robaxin and Ibuprofen (D.E. 52-4 at 97).

On February 2, 2011 plaintiff reported intense itching.  He said that he had been seen once before and was told the itching was caused by soap.  He said that he had not seen any insects but that he had insect bites (D.E. 52-4 at 99).  Plaintiff was seen the next day at his

cell and it was noted that he had little spots all over his body (D.E. 52-4 at 98). The urinalysis was performed on February 10, 2011 and was unremarkable (D.E. 52-4 at 100).

Also on February 10, 2011 plaintiff said that he was still itching and found a tiny white insect attached to a hair. He believed he had body lice or scabies (D.E. 52-4 at 102). Plaintiff was seen on February 11, 2011 and reported that he had been itching for two weeks and had scratched himself til he bled. He had red bumps on his chest, lower abdomen and thighs. He was diagnosed with allergic dermatitis and prescribed Calamine lotion, Hytone and Benadryl (D.E. 52-4 at 103).

On February 14, 2011 plaintiff asked to see medical personnel to discuss problems with his digestive system (D.E. 52-4 at 107). Plaintiff wrote again on February 28, 2011, saying he was in great pain and asking for a medical appointment (D.E. 52-4 at 108). Plaintiff was seen on March 2, 2011 with complaints of lower back pain, but it does not appear that any treatment was given (D.E. 52-4 at 109-116).

On March 7, 2011 plaintiff submitted a request saying that he had sought medical treatment on February 14 and February 28 but had not been seen by medical personnel. He also asked for more hydrocortisone cream because he was still itching and believed he was being bitten by dust mites (D.E. 52-4 at 116). Plaintiff was seen on March 11, 2011 and given more Hydrocortisone cream. It was noted on the record that an email was sent to the appropriate staff "for appointment within 7 days of sick call request." (D.E. 52-4 at 117-120). Plaintiff was seen again on March 16, 2011, still complaining of itching and red

patches on his skin.  He once again was diagnosed with dermatitis and prescribed

Triamcinolone cream (D.E. 52-4 at 123).

On March 21, 2011 plaintiff again asked to be seen by medical personnel because of

the itching.  He said that he believed he had scabies (D.E. 52-4 at 124).  Plaintiff sent

another request for medical care on March 23, 2011 complaining that the itching was

keeping him from sleeping (D.E. 52-4 at 125).  On March 28, 2011 plaintiff complained

about abdominal pains and constipation (D.E. 52-4 at 126).  On April 2, 2011 plaintiff was

seen and prescribed Milk of Magnesia (D.E. 52-4 at 127-133).  On April 4, 2011 plaintiff

submitted a request saying that it was the fifth time he had asked to see a doctor and he was

in constant pain (D.E. 52-4 at 134).  He was seen on April 6, 2011, diagnosed with

pediculosis (body lice) and prescribed Permethrin cream (D.E. 52-4 at 135).  On May 6,

2011 plaintiff asked for more Permethrin cream because he said that while it was effective,

he had been unable to reach his back to apply it there (D.E. 52-4 at 137).

On May 11, 2011 plaintiff asked to be tested for prostate cancer because he often

"experiences sharp pains, smells like crap." (D.E. 52-4 at 138).  On May 13, 2011 he

complained that prescribed medications had damaged his mucus membranes and that he had

no mucus membranes lining his bodily channels (D.E. 52-4 at 139).  Plaintiff was seen on

May 16, 2011, complaining of sharp pains on his cheeks and nasal stuffiness.  He also

requested that the scabies treatment be repeated.  He was prescribed another tube of

Permethrin cream, but never received it.  On June 4, 2011 plaintiff was assessed cell-side for

symptoms of scabies but the provider could not see his skin because of the dim light.  He

was seen in the clinic on June 8, 2011 but had no evidence of rash, bites or scabies (D.E. 52-4 at 140-143).

## B. Grievances

Plaintiff filed a Step 1 grievance on June 10, 2009 complaining that "PA Wolf" and other UTMB Medical staff had denied him medical treatment by failing to properly treat his serious sinus infection. He said he was suffering from loss of hearing, loss of weight and constant nose bleeds, headaches and dizziness. He also said medical personnel had prescribed medications that gave him only limited relief and had consistently given him shots and other medications for too long a period of time. Plaintiff asked to be seen by a medical doctor and that other corrective action be taken. He received a response on July 15, 2009 from defendant Burgin telling him that a review of his medical records showed that he had received appropriate care and that his complaint was baseless and without merit (D.E. 52-5 at 4).

Plaintiff filed another Step 1 grievance on August 23, 2010, complaining that he submitted sick call requests on August 10, 2010 and August 16, 2010 because he was spitting up blood and having trouble eating and swallowing but had not received medical care. He received a response on August 28, 2010 telling him that he had not gone to appointments on August 15, 2010 and August 18, 2010, but had walked into the dental clinic on August 18, 2010 and was told a tooth extraction was recommended. Plaintiff was advised that if his condition required additional attention he should fill out another request form so that an appointment could be scheduled (D.E. 52-5 at 6).

On September 27, 2010 plaintiff filed another Step 1 grievance, claiming that he had submitted sick call requests on September 15, 16, 17, and 18, 2010 but was being denied access to medical care.  He said he was suffering from constant throat pain and that his tonsils appeared to be rotten.  Plaintiff was advised on October 28, 2010 that he had been to a medical appointment on October 3, 2010 but his only complaint was that his right eye was puffy.  It also was noted that he complained of sinus related problems on October 20, 2010 but had failed to go to an appointment on October 21, 2010.  He was told to request an appointment if he needed another assessment (D.E. 52-5 at 7-8).

Plaintiff filed another Step 1 grievance on February 23, 2011 in which he complained that in response to a request to be seen for bugs eating his flesh, he was, as a joke, referred to the mental health department.  Plaintiff received a response on March 30, 2011 stating that no investigator thought his issue was funny and he was referred to the mental health department because he had said that he wanted to inflict harm on himself and the statement was taken seriously (D.E. 52-5 at 9-10).

## **APPLICABLE LAW**

### **A.  Motion For Summary Judgment**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See FED.R.CIV.P. 56(c).  An issue is material if its resolution could affect the outcome of the action.  Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir. 2001).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is

so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  The Court will not weigh the evidence or evaluate the credibility of witnesses.  Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The movant bears the initial burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  To sustain this burden, the nonmovant cannot rest on the mere allegations of the pleadings.  See Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Caboni, 278 F.3d at 451; FED.R.CIV.P. 56(e). After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted.  Caboni, 278 F.3d at 451.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense.  See Milchalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005).  When a government official has pleaded the defense of qualified immunity, the burden is on the

plaintiff to establish that the official's conduct violated clearly established law.  Id.  Plaintiff cannot rest on his pleadings; instead, he must show a genuine issue of material fact concerning the reasonableness of the official's conduct.  Bazen v. Hidalgo County, 246 F.3d 481, 490 (5th Cir. 2001).

**B.  Exhaustion of Administrative Remedies**

Defendants argue that plaintiff did not properly exhaust his administrative remedies because he did not complain about either of the individual defendants in his grievances. The Prison Litigation Reform Act provides the following:  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents.  Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002).  A prisoner is required to exhaust administrative remedies even if damages are unavailable through the grievance process.  Booth v. Churner, 532 U.S. 731, 740-741, 121 S.Ct. 1819, 1825,  L.Ed.2d 958 (2001).  A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court.  Woodford v. Ngo, 548 U.S.81, 90-91, 126 S.Ct. 2378, 2386, 165 L.Ed.2d 368 (2006).  Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints. Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 921, 166 L.Ed.2d 798 (2006).

The TDCJ-CID currently provides a two-step procedure for presenting administrative grievances.  Step 1 requires the prisoner to submit an administrative grievance at the institutional level.  Wendell v. Asher, 162 F.3d 887, 891 (5th Cir. 1998) (citing to TDCJ Administrative Directive No. AD-03.82 (rev. 1), Policy, ¶ IV (Jan. 31, 1997)).  After an investigation, the unit grievance investigator prepares a report and makes a recommendation to the final decision maker, which may be the warden, assistant warden, facility administrator, assistant facility administrator, or health administrator.  Id.  Step 2 permits the prisoner to submit an appeal to the division grievance investigator with the Institutional Division of the TDCJ.   Id.  After an investigation, the departmental grievance investigator prepares a report and makes a recommendation to the final decision maker for Step 2 of the process, which is the director, deputy director, regional director or assistant director.  Id.

The primary purpose of the exhaustion requirement is to provide prison officials with "time and opportunity to address complaints internally."  Johnson v. Johnson, 385 F.3d 503 (5th Cir. 2004) (quoting Porter, 534 U.S. at 525).  As acknowledged by the Supreme Court, Congress intended the administrative process to "filter out some frivolous claims and foster better-prepared litigation once a dispute did move to the courtroom, even absent formal factfinding."  Booth, 532 U.S. at 737, 121 S.Ct. at 1823.

The Fifth Circuit discussed how much detail is necessary in a prison grievance form in Johnson.  The Court noted that it has given relatively little guidance on what a prisoner must say in a grievance to properly exhaust his claims and added that as a general matter,

courts typically use a standard according to which a grievance should give prison officials

fair notice of the problem that will form the basis of the prisoner's suit.

> In deciding how much detail is required in a given case, we believe that a court must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials time and opportunity to address complaints internally. Thus, a grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit.

Id. at 516-517 (internal quotations and citations omitted).  The court added that as a practical

matter, the amount of information necessary in the grievance would depend on the nature of

the complaint.  If an inmate were complaining about the actions or inactions of a particular

prison employee, he would ordinarily be expected to provide details regarding the identity of

the employee and facts regarding the incident.  In contrast, if the inmate were complaining

more generally about something like vermin in his cell or high prices in the commissary, the

prison would be able to investigate the situation even if specific employees were not named.

Id. at 517.

   In his complaint, plaintiff claimed that defendant Herrera prescribed a medication for

a nasal infection that was for external use only, but directed plaintiff to apply it inside his

nose.  Plaintiff also claims that Herrera later diagnosed him with a mucous membrane

deficiency caused by the previous application of the antibiotic in his nose, the Kenalog

injections and the "chlorphen."  Plaintiff claims that defendant Burgin showed deliberate

indifference when he ignored plaintiff's repeated requests for proper treatment and when he

denied that plaintiff had ever received the double antibiotic cream.  Because plaintiff is

complaining about the actions of particular prison officials, he should have named them in

his grievances.  However, in the copies of the four Step 1 grievances submitted with

defendants' motion for summary judgment, neither Burgin nor Herrera is named and

plaintiff did not complain about the purported misdirected use of the antibiotic ointment.[1]

Although plaintiff did complain that he was being denied medical treatment, he did not name

Burgin.

     In his response to the motion for summary judgment plaintiff states that the assertion

that he failed to exhaust his administrative remedies is false and he refers to two grievances,

numbers 2009168226 and 2011093227.  The first grievance is the one plaintiff submitted on

June 10, 2009 and it does not mention Herrera or Burgin and does not discuss the antibiotic

ointment.  Plaintiff did not submit a copy of the second grievance and it was not found in the

record.  Thus, based on the evidence in the record, respondent is correct that plaintiff did not

properly exhaust his administrative remedies because he did not name the individual

defendants about which he complains and he did not describe how they violated his

constitutional rights.  Accordingly, plaintiff's causes of action should be dismissed for

failure to exhaust his administrative remedies.

**C.  42 U.S.C. § 1983**

     Notwithstanding the fact that plaintiff failed to exhaust his administrative remedies,

in the alternative it is recommended that his § 1983 action be dismissed because he has

---

[1]In the business records affidavit submitted with the grievances, Sandra K. Murphy stated that the records indicate that plaintiff also filed Step 1 grievance number 2011194227 related to code 499 but the file copy of the grievance has been misplaced. No explanation of the meaning of "code 499" is given (D.E. 52-5 at 2).

17

failed to overcome the defendants' assertions of qualified immunity.  To state a claim under §1983 a plaintiff must (1) allege violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.  <u>Moore v. Willis Independent School District</u>, 233 F.3d 871, 874 (5th Cir. 2000)(citing <u>Leffall v. Dallas Ind. Sch. Dist.</u>, 28 F.3d 521, 525 (5th Cir. 1994)).

Claims under § 1983 may be brought against persons in their individual or official capacities, or against a governmental entity.  <u>Goodman v. Harris County</u>, 571 F.3d 388, 395 (5th Cir. 2009)(citing <u>Board of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).  "Personal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" <u>Id.</u> (citing <u>Monell v. Dept. of Soc. Serv's of City of New York</u>, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).  In a personal-capacity suit, the individual defendant may assert personal immunity defenses such as qualified immunity.  Plaintiff in this case named Burgin and Herrera as defendants in their personal capacities.

**D.  Qualified Immunity**

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 815, 172 L.Ed.2d 565 (2009)(quoting <u>Harlow v. Fitzgerald</u>, 457

U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.  <u>McClendon v. City of Columbia</u>, 305 F.3d 314, 323 (5th Cir. 2002)(en banc).  To discharge this burden, the plaintiff must satisfy a two-prong test. <u>Atteberry v. Nocona Gen. Hosp.</u>, 430 F.3d 245, 251-52 (5th Cir. 2005).  First he must claim that the defendants committed a constitutional violation under current law.  <u>Id.</u> (citation omitted).  Second, he must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions about which he complains.  <u>Id.</u>  While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  <u>Pearson</u>, 129 S. Ct. at 818 (receding from <u>Saucier v. Katz</u>, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

**E.  Deliberate Indifference**

      Prison officials are liable for failure to provide medical treatment if they are deliberately indifferent to a prisoner's serious medical needs.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S.Ct. 285 (1976).  Deliberate indifference may be exhibited by prison doctors in their response to prisoners' needs, but it may also be shown when prison officials have denied an inmate prescribed treatment or have denied him access to medical personnel capable of evaluating the need for treatment.  <u>Id.</u>, 429 U.S. at 104-05, 97 S.Ct. at 291.  A prison official acts with deliberate indifference if he knows that an inmate faces a substantial risk of serious

harm and disregards that risk by failing to take reasonable measures to abate it.  Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970, 1984, 128 L.Ed.2d. 1970 (1994).

A plaintiff must show that the official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for his serious medical needs.  Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001)(citations omitted).  Although inadequate medical treatment may, at some point, rise to the level of a constitutional violation, malpractice or negligent care does not.  Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999)(citations omitted).  Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind.  McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)(citations omitted).  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S. at 106, 97 S.Ct. at 292. In addition, "a delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm."  Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993).

**1. Defendant Herrera**

Plaintiff asserts that defendant Herrera violated his Eighth Amendment right to be free of cruel and unusual punishment when he was deliberately indifferent to plaintiff's serious medical needs.  Plaintiff claims that Herrera gave him a double antibiotic ointment intended for external use only and told him to apply it inside his nose and that using the

ointment in that fashion caused him to experience hearing loss, dizziness, ulcers in his mouth and damage to his alimentary canal.

The only mention of defendant Herrera in the evidence submitted by the parties is that he is listed as the "prescriber" of several medications given to plaintiff in May 2009, including the double antibiotic ointment which plaintiff claims caused adverse effects. Although it is not at all clear that Herrera actually prescribed the medication, as opposed to authorizing it as the clinical supervisor, even if he had, and even if the medication caused unpleasant side effects, Herrera still would be entitled to qualified immunity. First, if the instructions to apply the medication to the inside of plaintiff's nose were incorrect, it still does not rise to the level of unnecessary and wanton infliction of pain repugnant to the conscience of mankind. At worst it would be negligence or malpractice. Second, Herrera's actions in prescribing the medication were not objectively unreasonable in light of the clearly established law. Plaintiff has pointed to no case law showing that off-label use of medication by prison medical personnel in an attempt to treat an ailment was known to violate an inmate's constitutional rights and none was found.

Plaintiff also claims that Herrera told him that his alimentary canal was damaged and nothing could be done about it. Assuming Herrera told plaintiff this, it does not amount to a constitutional violation. There is no evidence in the record that plaintiff's alimentary canal has been damaged and no evidence that Herrera ever examined plaintiff or had any reason to believe that his alimentary canal had been damaged. Even if Herrera said that, it does not make it true. Plaintiff cannot overcome Herrera's entitlement to qualified immunity on these

facts.  Accordingly, it is recommended that summary judgment be entered for defendant Herrera.

### 2.  Defendant Burgin

Plaintiff claims that even though he repeatedly requested medical attention for pain, itching and sores all over his body, Burgin ignored his complaints.  Plaintiff first began complaining about the itching in January 2011 and was not diagnosed and treated for scabies until April 2011.  However, on February 3, 2011 plaintiff was seen at his cell by a nurse at the request of defendant Burgin.  The nurse recommended that plaintiff be seen by a mid-level provider.  Plaintiff saw a nurse practitioner on February 11, 2011 who diagnosed him with allergic dermatitis and gave him medication for that condition.  On March 9, 2011 plaintiff complained again about the itching and was seen two days later and given more hydrocortisone cream.  Five days after that plaintiff was seen again and his medication was changed.  Plaintiff continued to complain about the itching and it was not until April 6, 2011 that he was diagnosed and treated for scabies.

In an affidavit, defendant Burgin stated that he worked as a practice manager at the McConnell Unit from September 11, 2006 until September 12, 2011.  He is not a medical doctor and did not treat inmates.  His job was to respond to inmate grievances about medical care.  He collected the grievances and submitted responses to them (Affidavit of William Burgin, D.E. 52-3 at 2).

Burgin did not recall plaintiff, but reviewed the letter dated September 2, 2009 that plaintiff wrote to Burgin (Burgin Aff., D.E. 52-3 at 3; D.E. 52-4 at 24).  In response to the

letter where plaintiff complained about the side effects from the antibiotic ointment, Burgin had the medical staff schedule an appointment for plaintiff with Dr. Stein (Burgin Aff. D.E. 52-3 at 3).  Burgin maintains that he had no further contact with plaintiff.  Regarding the note of February 3, 2011, where the nurse saw plaintiff at his cell and wrote, "Pt. referred by Mr. Burgin," Burgin states that he did not specifically refer plaintiff, but rather all of the inmates in Administrative Segregation.  The unit was on semi-lockdown and there was a shortage of TDCJ security staff available to escort the inmates to their medical visits. Burgin believes he was encouraging the medical staff to see inmates at their cells when they had requested a medical lay-in (Burgin Aff., D.E. 52-3 at 3-4).

In his response to the motion for summary judgment, plaintiff asserts that at some point in September 2009, after plaintiff's family members called Burgin, he summoned plaintiff to the medical unit and told him that he had never been prescribed a double antibiotic ointment and that if plaintiff continued with his frivolous complaints his "quest for treatment when he needed it would be ignored."  (Resp. to MSJ, D.E. 59 at 1).  Assuming this is true, it does not support a conclusion that Burgin violated plaintiff's rights.  The record is clear that plaintiff did receive the double antibiotic ointment and Burgin telling plaintiff otherwise after the fact did not harm him in any way (D.E. 52-4 at 6).  And even if Burgin told plaintiff that future requests for treatment would be ignored, they were not. After Burgin talked to plaintiff in 2009, plaintiff was seen and treated by medical staff on September 29, October 12, October 27, December 11, December 18, and December 31, 2009 as well as nine times in 2010 and at least 14 times in 2011 (D.E. 52-4 at 26, 33, 34, 36 and

37).  In addition, plaintiff was scheduled for a number of medical appointments which he did not attend.

There is no evidence in the record to support plaintiff's assertion that Burgin was deliberately indifferent to his serious need for medical care or otherwise violated his civil rights in any manner.  Accordingly, plaintiff cannot meet his burden of showing that Burgin is not entitled to qualified immunity and it is recommended that summary judgment be entered for defendant Burgin.  Plaintiff's cause of action should be dismissed with prejudice.

## RECOMMENDATION

Based on the foregoing, it is respectfully recommended that defendant's motion for summary judgment (D.E. 52) be GRANTED.  Summary judgment should be entered for defendants Herrera and Burgin because plaintiff failed to exhaust his administrative remedies and, in the alternative, because the defendants are entitled to qualified immunity.

Respectfully submitted this 28th day of March, 2012.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996)(en banc).